McGREGOR *v.* GRAND TRUNK ELEVATOR CO.

NEGLIGENCE—DEFECTIVE APPLIANCES—EVIDENCE.

Plaintiff contracted to make certain repairs to defendant's grain elevator, defendant to furnish the necessary ropes for a swinging scaffold. The rope furnished, and which plaintiff, who had done similar work for 17 years, examined without finding any defects, broke from dry rot, caused, it was claimed, by the dust in the elevator where it had been used. There was no testimony as to how long the rope had been in the elevator, nor as to the time within which dry rot might be expected to develop; and a large number of elevator men, including defendant's employé who furnished the rope in question, testified that they had never heard that elevator dust would cause dry rot in a rope. *Held,* that no negligence was shown on the part of defendant.

Error to St. Clair; Whipple, J. Submitted October 11, 1901. Decided March 4, 1902.

Case by William A. McGregor against the Grand Trunk Elevator Company for personal injuries. From a judg-

ment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*George G. Moore,* for appellant.

*Stevens & Graham,* for appellee.

MOORE, J.   In August, 1899, the plaintiff was at work upon a swinging platform, replacing the iron, and repainting it, on the side of an elevator owned by the defendant. One end of the platform gave way. The plaintiff fell a distance of about 70 feet, and was severely injured. He brought suit to recover damages. The case was taken from the jury by the circuit judge. The plaintiff has brought the case here by writ of error.

The defendant denied any neglect. It denied that it agreed to furnish plaintiff with suitable ropes. It denied that a rope furnished by its foreman was defective, but insists that the trouble was that a knot tied in the rope by the plaintiff himself was not properly tied, and slipped, thus causing the accident.

In his charge to the jury, the learned circuit judge, among other things, said:

"I understand the plaintiff's claim to be, briefly, as follows: The defendant, during the year 1898, had erected a new part or addition to its building; that the new portion had settled and fallen away from the old part, leaving a crack or opening between the two of from 4 to 12 inches in width, extending from the top to the bottom of the building, a distance of 70 feet and upwards. Plaintiff, having nailed the iron sheathing on the new part originally, and painted the whole building, was requested to present a bid for covering this crack at the north and south ends of the building, which he did about July 29, 1899, which was accepted by J. C. Johnston, secretary of the company, by telephone. Plaintiff claims that he then stipulated that Mr. Burke, foreman of the company, should furnish him with the necessary tackle and ropes with which to suspend his platform while doing the work, which was done, plaintiff arranging the tackle personally; that, among others, Burke handed him two ropes with which to make straps to be attached to the crosspiece nailed across two windows

in the building, 70 feet or more from the ground, to which he was to suspend his platform. These ropes he examined, unwinding the ends of one piece, and untwisting it in the middle, so as to examine it, then restored the rope to its original condition, seasoning each end, and with it made a round turn on the crosspiece, knotted the rope in such a way as to leave a loop, in which he fastened the tackle with which he elevated or lowered his platform or scaffold. Plaintiff claims this strap was affected by dry rot, peculiar to ropes used in and about grain elevators, of which he was ignorant, and which was commonly known by elevator employés, and should have been known by Burke, and that the company was negligent in furnishing him with a rope thus affected, the breaking of which without fault on his part rendered the company liable to respond in damages for his injuries, which were severe. * . * *

"I do not think plaintiff has shown the existence of such decay in ropes used in and about the elevator, and the common knowledge thereof by elevator men, as would render the company liable for neglect in not knowing this strap was rotten, because there is no testimony showing the length of time necessary to cause this condition, nor that this piece of rope had been exposed to the effect of elevator dust long enough, or so that this decay or rotten condition might or should have been expected. For those reasons, I instruct you that defendant is entitled to your verdict."

The claim of plaintiff, as stated by his counsel, is that:

"Defendant agreed to furnish the plaintiff with ropes with which to sustain his scaffold at an extremely perilous height from the ground, by which he might repair the side of its elevator. The defendant knew that the plaintiff's life would be endangered, on account of the great height that the scaffold was suspended, if the ropes furnished him were not sound and strong, and sufficient to sustain the ordinary weight and strain that would be placed upon them in doing his work. It was the duty of the defendant to furnish him with rope that was free from any rot, defects, or imperfections which reasonable and ordinary care on its part might guard against. The rope which defendant furnished did not have this strength, but, because it had been rotted by elevator dust, broke within five minutes after plaintiff began to work upon his scaffold. An inspection after the rope had broken, and while the

ends of it hung dangling in the air, disclosed that the strands at the point where the rope had broken were laden with dust, and that the color of the rope in these parts was darker and a deeper yellow than the natural color of the rope.   These were signs which, according to the testimony of the elevator men produced on the part of the plaintiff, showed beyond question that elevator rot existed in the rope.   A proper examination and inspection of the rope by Burke, the defendant's foreman, when he handed this rope to plaintiff, would have revealed that this rotten and dangerous condition existed.   The signs of elevator rot in this rope were unmistakable to any competent elevator man, and, had Burke made even a casual examination, he would have known that this dangerous rot existed in the rope that McGregor was about to use to sustain himself on a little scaffold more than 70 feet from the ground."

Was the judge wrong in holding the plaintiff had not shown the existence of such decay in ropes used in and about the elevator, and such common knowledge thereof by elevator men, as would render the company liable for neglect in not knowing that the rope was defective, because there was no testimony showing the length of time necessary to cause this condition, nor that this piece of rope had been exposed to the effect of elevator dust long enough so that this decay or rotten condition might or should have been expected ?   It is true that three witnesses testified that the effect of dust in elevators was to dry-rot Manilla rope, and that, when the rope assumed a deep yellow color, it was an indication that it had dry rot.   But none of these witnesses testified for what length of time there must be an exposure to dust to produce such a result, nor was it made to appear how long the rope had been in the elevator.   One of the three witnesses on cross-examination testified:

" I do not think a man, to take 1 out of 100, could take one of these lines and bring it here and see the rot on the inside.   But you can go and try the line; that is the way to test it.   To look at it, the nice yellow would be there yet, and would look like a perfectly good line; but go and put it on somewhere and try it, and then you would find

where the mistake would be. I don't think there would be any way that a line could be told, whether it was sound or unsound, unless you put a strain on it, that would be out of the ~elevator, unless it was a brand-new line. I would not like to run my risk without trying it, without it was a brand-new line, or I knew how long it had been in the elevator."

On the other hand, a large number of men who had worked in and about elevators testified that elevator dust did not have an injurious effect upon Manilla rope, and that they had never heard that elevator dust would dry-rot. Mr. Burke, who made the arrangement with McGregor to do the work, and who, plaintiff claims, furnished him with the ropes, testified to the same thing, as did Mr. Johnston, who authorized Mr. Burke to employ the plaintiff.

The plaintiff himself testified, among other things:

"I went in the elevator again, and asked Burke for a couple of straps to make these blocks fast. He was putting on his overalls, right in the way of the door. He put them on and buttoned them, and turned around about eight feet from the door, where there is a pile of junk there, and picked up two pieces of line, and said, 'There are two good pieces of line; they will hold you.' I said, 'Yes.' I took them out of his hand. He told me, 'There are two good pieces of line, Mac. They will do you.'"

Did the plaintiff rely upon this statement? On the cross-examination he said:

"Q. After he told you that, you still went to work and examined them?
"A. Yes, sir.
"Q. And you unlaid the rope?
"A. I unlaid both ends about that far, and laid it up again.
"Q. You unlaid it; that is, at the ends?
"A. Yes; a foot and a half, or, say, two feet.
"Q. Undid them?
"A. Yes.
"Q. So you had the whole of the fiber exposed there?
"A. Yes.
"Q. At those ends?

"*A.* Yes, sir.  *  *  *

"*Q.* How did you fix the ends of the rope so they wouldn't unravel, after you had unwound them? How did you fix them back? How did you fix the ends of the rope after you unwound them, so they wouldn't unravel?

"*A.* I laid them up again, and put a rope yarn around the end of them.

"*Q.* Did you season both ends?

"*A.* Yes.

"*Q.* With a little bit of the rope?

"*A.* Yes, sir.  *  *  *

"*Q.* It appeared to you to be strong?

"*A.* Yes, sir.

"*Q.* And you have used ropes for this purpose for how many years?

"*A.* Off and on, when I struck a job like that, I have used them for 16 or 17 years, when I have to do a high job.

"*Q.* And you have worked around this same elevator the year before, there, for some two or three months?

"*A.* Yes, sir."

It is true, he testified he knew nothing about elevator dust causing dry rot; but Johnston and Burke testified they knew nothing of elevator dust causing dry rot. If this plaintiff, who had pursued a business for 17 years where he used a rope for like purposes, and where his safety depended upon the strength of the ropes he used in suspending his scaffold, was not negligent in not discovering the trouble with this rope and in the use of it, we do not see how the defendant can be regarded as negligent because its employé who furnished the rope did not have any knowledge of any defect in the rope, and when the record does not show anything in the nature of his employment which would make it likely he would know whether a rope which appeared strong was in fact affected with dry rot.

In view of all this testimony, we think the action of the judge in directing a verdict should be affirmed.

HOOKER, C. J., and MONTGOMERY, J., concurred. LONG and GRANT, JJ., did not sit.